**Eugene MANGAN, Plaintiff-Appellant,**

v.

**BRODERICK AND BASCOM ROPE COMPANY, Defendant-Appellee.**

**No. 14738.**

United States Court of Appeals
Seventh Circuit.

July 27, 1965.

Rehearing Denied Oct. 18, 1965.

James A. Dooley, Chicago, Ill., for plaintiff-appellant.

Reese Hubbard, Alvin G. Hubbard, Chicago, Ill., for defendant-appellee.

Before HASTINGS, Chief Judge, DUFFY, Circuit Judge, and MERCER, District Judge.

MERCER, District Judge.

Plaintiff, Eugene Mangan, filed his suit against the defendant for damages for personal injury. He prosecutes this appeal to review a judgment entered by the court below upon a verdict rendered by a jury finding the issues for the defendant. The action of the trial judge in refusing to permit plaintiff to read certain requests for admissions to the jury and other allegations of trial error are asserted as the basis for plaintiff's contention that the judgment should be reversed and the cause remanded to the court below for a new trial.

On and prior to December 1, 1960, plaintiff was an employee of Schweitzer & Company which was then engaged in the construction of a concourse building at O'Hare Field. For some five weeks prior to the occurrence which gave rise to this suit the crew of which plaintiff was a part had been engaged in the installation of precast concrete panels used in the construction of the walls of the building. The panels, which weighed from 3000 to 3500 pounds each, were lifted by a crane to the second floor of the building where they were fitted into bays in the building wall. Each bay held four panels. Limited clearance within the bays required that a sling method be used to install the number 4 panel in each bay, although other means were used to lift the first 3 panels into place. A sling was fashioned from wire rope, or cable, wrapped around the concrete panel and wood softeners used to guard the panel from damage by the cable. In each such operation, the sling was rigged securely around a panel and the hook on the crane was fastened on the outside of the wire sling thus formed. The panel would then be lifted into the air in a vertical position to a height of about 4 or 5 feet. At that point, the ground men on the project attached a manila guide line to the cable which men working on the second floor manipulated as the panel was raised to guide the panel into place.

Schweitzer used one-quarter inch cable as slings on the number 4 panels. Each cable could be used for approximately 6 to 8 times before it was worn to such extent that replacement was necessary. At the start of the project one-quarter inch 6 x 19 cable was used for the sling.[1]

1. Wire rope, or cable, is designated in the trade by the diameter of the cable and a numerical designation of the number of strands in the cable and the number of

About the middle of November, 1960, Schweitzer's supervisory employees decided to order some one-quarter inch 6 x 37 cable because they felt its greater flexibility would give more ease of handling and better wearing quality. The job superintendent directed Schweitzer's timekeeper to order some 6 x 37 cable from the defendant. That order was placed by phone to defendant's warehouse on November 14, 1960, for 50 feet of 6 x 37 cable. A sales trainee at defendant's warehouse obtained a coil of cable from the warehouse and delivered it to the "little shed" at the concourse project. Schweitzer's timekeeper receipted for the delivery.

On December 1, 1960, the job superintendent sent the plaintiff to the iron worker's shanty where cable was stored to obtain some cable to replace the one being used for the sling. Plaintiff testified that he found a coil of new cable hanging in the shanty and that it was the only cable that was in the shanty which had not been used. The cable was then made into a sling around a number 4 panel in the manner above described, and the crane operator lifted the panel to a height of about five feet to the proper position for attachment of the guide lines. While plaintiff and another employee were tying the ends of the guide line to the sling, the cable broke and the panel fell striking the plaintiff and injuring him seriously and permanently.

Plaintiff's foreman arrived at the scene before plaintiff was removed to the hospital and saw the sling cable lying on the ground broken. Thereafter, he and Schweitzer's job supervisor examined the cable and upon counting the strands discovered that it was 6 x 7 cable. Schweitzer's supervisory employees testified that no one-quarter inch 6 x 7 cable had ever

been ordered by them for the O'Hare project, and that no cable of such composition was ever used on the project. Subsequent laboratory tests of the broken cable showed it to be one-quarter inch in diameter and consisting of six strands, with each strand made up of seven wires wound around a hemp center. The test revealed that the breaking strength of the cable was about 2330 pounds.

Schweitzer's job superintendent testified that he was familiar with the cable stored in the ironworker's shanty; that 50 feet of 6 x 19 quarter-inch cable had been received from another supplier on November 3, 1960, and that all such cable had been used prior to December 1, 1960; that for a period of some 10 days prior to December 1 there was only one piece of new and unused cable in the shanty; and that the cable was in a coil the way it had been received, and that the coil was 50 feet in length. He further testified that he had examined all cable on the concourse job on December 2, 1960, and that he could find no 6 x 37 cable on the job, either new or used.

Plaintiff's complaint charged that his injury came as a proximate result of defendant's negligence, among other things, in supplying a cable of inferior strength and different from the one that had been ordered, in selling a cable which was unfit for the purpose for which it was ordered, and in failing to warn plaintiff that the cable was unfit for the purpose for which it was intended.

We turn first to the alleged error in the court's refusal to permit plaintiff's requests for admissions to be read to the jury. On August 23, 1962, plaintiff filed 14 requests for admissions of fact which, so far as here pertinent, requested admissions that Schweitzer had ordered 6 x 37 wire rope from defendant, that wire rope was delivered by the defendant

---

wires in each strand. Thus 6 x 19 cable is cable having six strands with nineteen wires in each strand. Other cable strengths are similarly designated in this opinion without specific description thereof.

The evidence indicates that all wire cable of the same diameter is identical in appearance. The only way to distinguish one-quarter inch 6 x 19 cable from one-quarter inch 6 x 7 cable is to take one of the strands apart and count the number of wires therein.

to Schweitzer pursuant to that order prior to December 1, 1960, and that "the wire rope sent Wm. E. Schweitzer and Co. was composed of 6 strands with seven wires in each, or 6 x 7 wire rope". The requests above summarized were requests numbered 1 and 4. The request above quoted was request number 5. Thereafter on September 4, 1962, defendant filed a motion praying that it be relieved from answering plaintiff's requests numbered 11, 12, 13 and 14, and that an order be entered extending the time within which defendant could answer the balance of the requests for admissions. On September 10, 1962, defendant moved for a hearing on its objections to requests numbered 11 to 14. Judge Hoffman entered an order sustaining defendant's objections to those requests. Defendant did not seek or obtain a ruling on that portion of its motion requesting an extension of time to answer the balance of the admissions, and defendant did not, in fact, at any time deny or otherwise answer plaintiff's requests numbered 1 through 10. That was the situation prevailing at the time when the cause went to trial.

At the outset of the trial, plaintiff sought to read his requests numbered 1 through 10 to the jury. Upon the representation of defendant's counsel that objections to all requests filed by the plaintiff had been sustained, the court asked plaintiff to pass the matter of the admissions until the record could be checked. During the course of the trial, several other discussions between court and counsel were had relative to use of those requests. Ultimately, the trial judge indicated his opinion that defendant's failure to respond to the requests would be tantamount to admission of the facts therein stated, but that plaintiff had abandoned his requests by his subsequent filing of interrogatories addressed to the same subject matter.

 That ruling was error. A party's failure to file a verified response to requests for admissions under Rule 36 admits the truth of all matters therein stated, Water Hammer Arrester Corp. v. Tower, 7 Cir., 171 F.2d 877, 879, Adventures in Good Eating v. Best Places to Eat, 7 Cir., 131 F.2d 809, O'Campo v. Hardisty, 9 Cir., 262 F.2d 621, and unanswered requests are not abandoned by the subsequent filing of interrogatories addressed to the same subject. Woods v. Robb, 5 Cir., 171 F.2d 539. Where no response is made to requests for admissions, the party making the requests is entitled to rely thereupon and no further proof is required to be made of the facts thus admitted. Water Hammer Arrester Corp. v. Tower, supra.

That error alone would require reversal of this judgment. Plaintiff advised the court below that his trial preparation was made on the theory that these unanswered requests would stand admitted. The exclusion of those facts from evidence may well have made the difference between a verdict for the plaintiff and the verdict rendered.

 There is absolutely no merit to defendant's contention that the request was deficient because it did not fix a time within which defendant's response thereto was required. Defendant did not object to the sufficiency of the requests in the trial court. It cannot now object to the form of the request. Rule 36 places the burden upon a party to whom requests are directed to take some affirmative action, either by response to the requests or by objecting thereto if any ground he has. Water Hammer Arrester Corp. v. Tower, supra. Having done nothing as to requests 1 to 10, inclusive, defendant must bear the consequences of their standing admitted.

 Reversal of the judgment is also required because evidence of workmen's compensation benefits was injected into the case. Immediately prior to the commencement of the trial, the trial judge expressed his general view that such evidence would not be admitted, though he reserved his final ruling thereon. He told defense counsel to refrain from such inquiry until a ruling was made by the court. Notwithstanding that admonition, defendant's counsel sought to ask Schweitzer's office manager if compensa-

tion had been paid to plaintiff and if Schweitzer would recover substantial sums if plaintiff was successful in this suit. Objections to those questions were sustained, and defendant's offer of proof was denied. Subsequently, in his examination of one of the treating physicians, counsel asked the physician who had paid plaintiff's bill and elicited the answer that the insurance company had done so. The question and answer were stricken. Though the court chastised counsel for his deliberate disobedience to the court's prior admonition, plaintiff's motion for a mistrial was denied.

Later, in the trial, but yet prior to the court's ruling on admissibility, counsel for defendant posed similar questions to the witness Borchardt. Ultimately, in apparent reliance upon Mokrzycki v. Olson Rug Co., 28 Ill.App.2d 117, 170 N.E. 2d 635, the court allowed Borchardt to be cross-examined relative to the workmen's compensation situation and allowed defendant to show through Borchardt that a workmen's compensation claim against Schweitzer was then pending before the Illinois Industrial Commission. The court below reasoned that such cross-examination was proper to show the possible prejudice and bias of the witness as an employee of Schweitzer.

This court, among others, has stated that testimony of that nature is highly prejudicial to a plaintiff's case. E. g., Eichel v. New York C. R. Co., 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307; Tipton v. Socony Mobile Co., 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4; Goldman v. Checker Cab Co., 7 Cir., 325 F.2d 853, 856; Bryntesen v. Carroll Const. Co., 22 Ill. 2d 63, 174 N.E.2d 172; O'Brien v. Chicago City Ry. Co., 305 Ill. 244, 262, 137 N.E. 214, 27 A.L.R. 479; Burnett v. Hernandez, 9 Cir., 263 F.2d 212. Cf., King v. Grimm, 7 Cir., 300 F.2d 658, 660. Unless such evidence has some legitimate purpose other than to advise the jury that a plaintiff has been partly paid for his injury, a strict exclusionary rule should be applied.

■ In this case, the conduct of defendant's counsel in his cross-examina-tion of Schweitzer's office manager, the doctor and Borchardt in defiance of the court's admonition was an act not to be condoned. The motive for such questioning could not have been entirely an attempt to show possible bias of the witnesses. The doctor was not a Schweitzer employee. He could have no possible interest in the case. Borchardt was not a Schweitzer employee as we shall presently show. Thus, even if the judge was correct in his ultimate ruling that evidence of the receipt of workmen's compensation might be adduced to show the possible bias of witnesses, we are still faced here with gross error. Counsel's willingness to inject that evidence into the case at any cost is sufficient to earn him a new trial for plaintiff.

The cross-examination of Borchardt which the court permitted must be reviewed in a different light. In the Olson case, the plaintiff, an employee of Globe, was injured while unloading a boxcar which he alleged Olson had negligently loaded. The court held that cross-examination of Globe's plant superintendent relative to Globe's interest in plaintiff's suit because of workmen's compensation benefits paid to plaintiff was permissible for the limited purpose of showing the possible bias of the Globe employee as a witness. Mokrzycki v. Olson Rug Co., 28 Ill.App.2d 117, 125–127, 170 N.E.2d 635.

We believe that Olson is so inconsistent with several opinions of the Supreme Court of Illinois that that decision does not reflect the law of that state. Compare, Bryntesen v. Carroll Const. Co., 27 Ill.2d 566, 190 N.E.2d 315; Rylander v. Chicago Short Line Ry. Co., 17 Ill.2d 618, 622–628, 161 N.E.2d 812; O'Brien v. Chicago City Ry. Co., 305 Ill. 244, 262–263, 137 N.E. 214, 27 A.L.R. 479.

■ The rationale of Olson is that every employee witness is suspect if his employer may possibly have a lienable interest in any recovery by a fellow employee against a third-party tort-feasor. To us that is sheer folly. Though we cannot always discern the motives of men, we cannot conclude that every salaried employee is likely to testify falsely to

enhance the chances of his employer's claim for money. Any slight value which such evidence might have in discrediting a witness is far outweighed by the likelihood that such evidence will be misused by a jury. Tipton v. Socony Mobile Oil Co., 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4; Eichel v. New York C. R. Co., 375 U.S. 253, 84 S.Ct. 316; Burnett v. Hernandez, 9 Cir., 263 F.2d 212. Indeed, we can conceive of few instances in which the value of such evidence would merit the effort of its producement if the evidence did not at the same time advise the jury that the plaintiff had already collected some money for his injury. As one court pointed out the "smell" of insurance or workmen's compensation must be presumed to affect a jury adversely to a plaintiff's cause. Burnett v. Hernandez, 9 Cir., 263 F.2d 212, 214.

█ Though we can conceive of instances in which the compensation factor might have the effect of discrediting a witness, we think that the use of such evidence should be limited to instances in which possible bias is revealed by some act or factor more profound than the mere fact of employment by a particular employer.

We are, therefore, constrained to disagree with the Olson opinion.

█ In any event, the cross-examination of Borchardt relative to Schweitzer's compensation was error irrespective of the status of Olson as authority. Borchardt was not a Schweitzer employee.

He was employed by Martin Boyer Company, an investigator employed by Schweitzer to process its workmen's compensation claims. There is nothing to indicate that the salary of Borchardt or the fees of Boyer were in any way affected by the Schweitzer lien claim. Borchardt was permitted to testify that plaintiff had a suit pending against Schweitzer before the Illinois Industrial Commission. The jury may well have implied from that testimony that plaintiff was alleging that Schweitzer had been negligent and that, therefore, plaintiff could not recover from defendant.[2] The testimony had no possible tendency to discredit the witness. Its only tendency was to prejudice plaintiff's rights.

█ Though it is not likely to recur on a new trial of this case, we think one other aspect of this appeal should be briefly mentioned. After the jury had deliberated for some six hours, the jurors were permitted to separate and to go to their homes for the night. Shortly after they met on the following morning, the court gave the jury an additional charge which tended, among other things, to tell each of the jurors being in the minority on the panel to re-examine his appraisal of the evidence in the light of the fact that a majority of their number, who were equally intelligent people, disagreed.[3] We think it error to so charge a jury unless a like admonition, equally specific, is likewise addressed to those jurors holding a majority view of the evidence.[4]

---

2. That hypothesis is contrary to the established rule of law that the negligence of an employer is not imputable to his employee in a suit against a third person. Giguere v. United States Steel Corp., 7 Cir., 262 F.2d 189; Rylander v. Chicago Short Line Ry. Co., 17 Ill.2d 618, 161 N.E.2d 812.

3. The court told the jury, in part:
 "Now, I don't know how this jury stands as between those who may be at this moment in favor of the plaintiff or in favor of the defendant, and I don't want to know.
 "However, I'll say this, if much the greater number of you are in favor of a verdict either for the plaintiff or for the defendant, each dissenting juror ought to consider whether his appraisal of the evidence, of the weight of the evidence, is a correct one, since it makes no effective impression upon the minds of so many equally intelligent fellow jurors, who bear the same responsibility, who serve under the sanction of the same oath and who have heard the same evidence, with the same attention and with equal desire to arrive at the truth."

4. A similar instruction has been held to be improper. E. g., Acunto v. Equitable Life Assur. Soc., 270 App.Div. 386, 60 N.Y.S.2d 101, Lennox v. White, 133 W. Va. 1, 54 S.E.2d 8, and Mead v. City of Richland Center, 237 Wis. 537, 297 N.W. 419.

Finally, the conduct of defendant's counsel in cross-examining a witness upon an exhibit which was not in evidence and which was never offered in evidence was such a deliberate misuse of the judicial process that it must not be repeated upon a retrial of this suit.

We have considered and rejected all of the defendant's arguments for affirmance which are not specifically mentioned herein.

For the reasons above stated, the judgment is reversed and the cause is remanded to the court below for a new trial.

Reversed and remanded.